Now we'll hear Grice v. McVeigh. Good morning. Thomas Trollity for the appellant. There is no disputed issue of fact in this case on the core finding that the plaintiff, Gregory Grice, was detained in handcuffs for 45 minutes while at this railroad crossing. But it was 33 minutes for this particular defendant. It was... I'm going on the long side, Your Honor. No, there were a number of defendants. Turn him over to the MTA. Yeah. Yes. It was approximately... He's collected $25,000 in damages, but this case concerns, I think, the first 33 minutes of being handcuffed. Okay. Then that's the undisputed core fact in this case. It is our position that this was a Terry stop, which illustrates the very... Why didn't you have reasonable suspicion? to detain this man? And you not only detained him, you arrested him. The radio call was for a white person, number one. Number two, when you approach this lead, he was standing where he had every right to stand. He had a camera and a scanner, which he had every right to possess. Your Honor... I don't see... I don't even see the... First of all, I don't see the reasonable suspicion, so help me with that. And secondly, he was arrested, and I see no probable cause, no basis for this man's arrest. Well, the lower court, first of all, Your Honor, decided as a matter of law, there was reasonable suspicion to detain him. And it is clear that... Well, what was the reasonable suspicion? The reasonable suspicion was that there was a radio dispatch from Greenberg Police Headquarters on the 911 call from the passing motorist, that there was a white male, and that was a mistake by the dispatcher, but it doesn't have any significance, that there was a male in a red shirt... But the cops were told that there was a white person there, right? That's how it was dispatched, yes, mistakenly by the dispatcher, but it was a male in a red shirt bending down by the train tracks at Virginia Road Railroad Crossing with a remote control object in his hands. No pedestrian should be in a railroad crossing by train tracks where they're actually trespassing or not, unless they work for a common carrier and are doing maintenance on railroad tracks. He was wearing a red shirt when Sergeant McVeigh pulled up in his police vehicle, he confirmed... The arrest took place by a right-of-way across the railroad tracks. He had a right... Any member of the public had a right to cross the railroad tracks where this kid crossed the railroad tracks. He did, Your Honor, but he was holding what appeared to be a remote control device. The police had a right to detain, to investigate what he was doing by these railroad tracks. How long did it take two, seven sentient police officers to determine that a camera was a camera? Well, they determined that he had a camera, he had a... And he had a scanner. He had a scanner. How long should it take a dozen police officers to determine that a scanner is a scanner? This kid had a right to possess what he possessed. And the police officers, granted, were entitled to confirm what he had, but that seems to me it was easily done and didn't have to arrest him to do it. Officer McVeigh, Your Honor, was the commander of the Specialized Weapons Unit. He should have known better. All the more reason to use common sense and common judgment. Your Honor, don't you have a little better argument than you're making in the sense that, you know, just in the give and take that's going on here, that there had been prior incidents where the officers had been told and trained about the possibility of terrorism coming up on 9-11 anniversary, that they were sensitive to that question, and that they were going to err on the side of protecting the public by making sure that there were no explosives on the tracks. And that those are the steps that he took, whether that's sufficient or not, I don't know, but those are the steps that he took. He got there. He was polite to the guy. He said, look, I'm going to cuff you because I want to be sure what's going on. And it's to say it's for the security of others and of yourself that I'm going to do that. And then they made an effort to do an investigation, and at some point they released him, but during that investigation, they said as soon as the MTA confirms that there are no explosives on the track, you'll be free to go. And so whether it justifies it, I don't know, but there was an excessive effort to watch out for a problem here that the police were undergoing. I don't agree it was excessive, Your Honor. Any common person knows that something as benign as a cell phone. Whether it was excessive or not, it was out of the usual thing. If this guy had been seen, I don't know, walking, you know, being public urination-tated, that would have been a different case. This was a terrorism, a potential terrorism case, right? Exactly, Your Honor. Yeah. And he had electronic equipment out there. Cell phones today, as they advertise. Yeah, I think he did, but as Judge Parker has pointed out, that was dispelled pretty quickly, right? Your Honor. Are you saying that someone hangs around a crossing, a railroad crossing, who has a cell phone? No. There's probable cause or reasonable suspicion to stop them, and while you stop them and talk to them, you can handcuff them? It seems weird. Your Honor, in the Compton case, which Judge Walker authored just last July in a Terry Stop case, you've got to look at the totality of the circumstances, look at it through the lens of the police officer on the scene, and look at his experience, and be guided by his experience and training. The fact that he wasn't on the tracks when the officer got here is irrelevant, because the report said he was on the tracks, and obviously, he could have moved. He's by the tracks. I think that's what's most important. He's got a cell phone. These cell phones today, Your Honor, with a simple application. He showed you the letter that he had received from the MTA, explaining what he does. But it's not mutual exclusive, Your Honor. He could have a right to be there in the email, which said, you can't be on our property, and you should be at a safe distance. That doesn't make it mutually exclusive that he may have been there committing wrongdoing. When this army of cops showed up, he was at where he had a perfect right to be. He may have had a right to be there. I'm not arguing this is a trespass case. But the police had an obligation to investigate and make sure those tracks were safe, that he hadn't placed anything on those tracks. We have cell phones that can shut off lights, as they advertise, in the Bahamas, here in Brooklyn, we can shut off lights. We have a technology today, where things can be triggered remotely. Sergeant McVeigh knew that, had specialized training on that. If you're in the record, we have Grice's cell phone audio recording. When Sergeant McVeigh pulled up- But the more you argue that common implement, like a cell phone, can remotely cause a train to blow up, the more you're saying that anybody with a cell phone on a platform, with their briefcase, ready to go to work- He wasn't on a platform. Or a laptop. Or a laptop. There was no platform. A laptop or an iPad could be subject to arrest. Well, if you're in a- You can't bring in, there are all kinds of flights now that you can't bring laptops. But then we're totally ignoring the totality of circumstances. It's in a railroad crossing. I'm quite familiar with the totality of the circumstances. I'm not ignoring them. So, in the initial recording, audio recording- Pardon me? In the initial audio recording, cell phone audio recording of Grice himself, you hear Sergeant McVeigh say four times in a couple of minutes, keep your hands here. I need to see your hands. Please put your hands on the barrel. He was obviously, he didn't have a gun. He didn't have a knife. I don't think there was any suspicion that he had that. But these two- How many cops were there? Ultimately, there were probably a dozen cops that showed up. But Sergeant McVeigh didn't control that. He was the initial responding officer. He didn't call those police officers. They have to show up. They didn't need all those police officers to detain Grice. They were there to perform a complete and orderly search of the train tracks. Didn't these police officers, at a certain point, satisfy themselves that we had a train buff here? Why did they turn him over to the MTA in handcuffs? Well, at some point after the MTA officers arrived, following Grice's placement in handcuffs- We're dealing with 33 minutes in which this particular defendant, I mean, that's all we're looking at. We're looking at this defendant, and he was there first on the scene. But after 33 minutes, why would he turn him over to somebody else? It was perfectly obvious that he's a train obsessive. There are people like this. Because after that period of time, the police were able to either verify or dispel, as they ultimately did, that he had not committed any wrongdoing and the train tracks were safe. I thought that the- For passage. But they didn't let him go? These police did not think that they were, the first people who arrived, McVeigh and the others, who were the local police, didn't think they were in a position to be able to verify that there wasn't an explosive on the track, that they needed the MTA for that purpose. They did. That's correct, your honor. When did the MTA arrive in relation to this, after McVeigh? The MTA arrived about 20 to 25 minutes. The initial officers in MTA arrived 20 to 25 minutes after Sergeant- You said the initial officers, were there subsequent officers? There was, there was a sergeant from the MTA who arrived a few minutes later. But they started, how long did it take them to examine the tracks? Was that done by the first group, or did it require- No, the Greenberg police made a decision to have the MTA personnel who are familiar with their own mechanical equipment, switching gates, especially in view of the Patterson case, which had occurred just three weeks earlier, and was placed in the roll call alert that was read in Greenberg, to have them check with their signal and communications people, check the crossing gates, ensure that no spikes or clips had been removed from the tracks, and they had the yardmaster come out and check the mechanical equipment. In the MTA report, it reveals that their officers and a canine went, I think it was 200 yards, up and down each side of the track in each compass direction to ensure that there was nothing on the tracks. That took, your honor, it's concluded it's 33 minutes, I thought it was more like 45 minutes. But either way, it took that reasonable period of time- It was 33 minutes before he released. Yeah, about that. When was he finally released? By Sergeant McVeigh, he was released almost immediately after it was determined that he had not committed any wrongdoing and the tracks were safe for train passage and vehicular traffic. When you say not committed any wrongdoing, to be precise, that he hadn't put an explosive on the tracks. There was still the issue of trespass. That's why the MTA took the- Not for the Greenberg police. No, I understand that. Yes, yes. But that's why they turned it over to the MTA, because it was still an issue of trespass at that point. They turned it over, no, Sergeant McVeigh, Lieutenant Farina turned it over to the MTA because they wanted to verify Grace's identification, didn't even know who he was. He didn't have any identification with him. And then the MTA took him to Mount Vernon. How many police knew this kid? A couple of the officers said they had recognized him as someone who had attended some of their meetings. But that was after- He wasn't from Yemen, right? No, but does someone have to be from Yemen to be a physical threat in a railroad crossing while in possession of electronic equipment? And- No, it's a- The two ways to look at this case, you look at it from Grace's side and you look at it from the policeman's side, and you get different ideas about this. I mean, whether the police went overboard and did too much to try and protect this situation and ignored this guy's rights is the question in this case. But one can understand, to some extent, I think, why police would want to be cautious after Patterson to make sure that there wasn't a problem here. We've dealt with this in other contexts, let me put it this way, in the terrorist situation. Your Honor, this is the lower court focused on Grace following the pat down by Sergeant McVeigh, not being in possession of a weapon, a gun, a knife. But this court has recognized the circumstances where handcuffing is justified if even an unarmed person poses a present physical threat and has a flight risk. Both of those- But then the question is, once you find out that he doesn't do that, do you still keep him cuffed? Do you still keep him restrained? Yes. Because the exigency that caused that in the first place now has been dispelled. If they didn't do that, there were so many things that could have gone wrong here. In the audio recording, what Sergeant McVeigh did first was he neutralized any use of Grace's hands where he could push a cell phone on the pad. He didn't know exactly that it was a scanner. He knew it was a scanner, but there are buttons on there, there's an antenna. It sure seems like he was capable of causing some pretty significant destruction out there, remotely, as we all know can be done in today's sophisticated technological world we live in. So McVeigh expressed that concern on the recording. He kept going back to his hands, and he said to him, for your safety and my safety, I'm going to handcuff me. He neutralized the threat of Grace being able to use his hands, not knowing what had been in the backpack, what object or device Grace might have placed on the tracks even before McVeigh got there. When he had heard over the radio that a motorist said he was kneeling on the tracks, not just standing on the tracks, kneeling by the tracks, and he's holding a remote control device. Contemporaneously, just five minutes before McVeigh got there. And then what McVeigh did, once he neutralized the physical threat, he took care of the flight wrist. In the audio recording, he has Grace sit down while he's rear cuffed. Even for a physically agile 16 year old, and 16 year olds, your honor, I heard you say in the Monticello case, when a person is confronted by the police, they're not always docile. And as Sergeant McVeigh testified, maybe less than eloquently, kids do stupid stuff, they flee from police. Had this 16 year old fled, he could have been electrocuted on the third rail, which is shown in the photograph as part of- We are, the more you talk about this, the more I wonder whether it is not so that Judge Seibel denied summary judgment on qualified immunity on the ground that there are issues of fact. There are no issues of fact, your honor. This is all established- I mean, you're arguing things from this point of view and that point of view. Now, do we have jurisdiction if the district court says that there are issues of fact that bar summary judgment? They say they denied the motion. Judge Roman said he denied the motion because the issues of fact- I thought it was Judge Seibel. No, it was Judge Roman, but there are no issues of fact. It's 45 minute, 33 minutes to 45 minute detention. You're saying that the fact is taken in light of the other side, fully taken in the other side. All inferences draw in that favor that there's no issue of fact. I mean, it can be decided as a matter of law in your favor. Even if you take my longer period of 45 minutes and you have him in handcuffs, so they could dispel that he had, or verify it. You've reserved some rebuttal time. I did, thank you. We'll hear the other side. Good morning, your honors. Good morning. My name is Lissa Greenstark and I represent the appellee Gregory Grice. I want to first address something that came up during the argument about this 33 minutes. First of all, he was held beyond those 33 minutes because of McVeigh. McVeigh told the MTA and every other officer at the scene that when he arrived, Mr. Grice was standing on the tracks and that he arrested him for trespassing. That's where this trespass charge came from. And under Kerman, McVeigh is liable for those consequences. It was a foreseeable consequence of his false claim that he observed Mr. Grice on the tracks, that Mr. Grice would be arrested, that he would be issued the summons from the MTA, that he would be prosecuted. All of these things are foreseeable from his claim, and so what we really have here is a straightforward false arrest case. We have, on the one hand, McVeigh saying, Mr. Grice was on the tracks. You have, on the other hand, Mr. Grice saying, I was at all times- So you're only complaining about the turnover. No, we're not. We're saying what I- Let's break it down. You're complaining about the turnover, which you just talked about, which you said was done on a false pretense. And then you're also complaining about the finding of reasonable suspicion and probable cause? Yes, both. Because based on this phone call, there's just a bare bones anonymous tip. A white male- Well, he wasn't anonymous, to be fair. The name was known, and that was determined. There was a problem here, because at one point, the officer who wanted to follow up on the call was given the wrong number by the dispatcher and couldn't make that call, but the name was given. The person gave her name. It wasn't anonymous. She could have been contacted had they been able to get the right number. And the description that she gave, or the dispatcher gave, was not the actual description. He made a mistake. He said white. But he did say that there was a person over the tracks, or on the tracks, presumably according to the report, not in a safe place, not on the road, on the other side near the tracks, wearing a red shirt. And so when the officer shows up, that call is corroborated by the red shirt and by the fact that it's a male. Well, there's a few things I'd like to address that you just mentioned. First, the information that the complainant had left a phone number and a telephone cannot be imputed to McVeigh. When McVeigh arrived, all he knew based on the dispatch was that an unknown complainant who had left the scene five to ten minutes before had seen this thing that wasn't even a crime. Isn't it imputed to the knowledge of each officer what every other person in law enforcement knows? For the purpose of ascertaining probable cause or a reasonable suspicion. Not at the moment of arrest, and Mr. Grice was arrested at the moment that McVeigh arrived. He told him to freeze. He said don't move your hands. He arrested him, and at that point, the information that the dispatcher had isn't imputed upon McVeigh. I just want to- Why wasn't this a Terry stop? It wasn't a Terry stop because the level of intrusiveness rose well above a Terry stop. As soon as you put on cuffs, the Terry stop ends. That's your rule? That's what you think? As soon as you put on cuffs, it's an arrest. It's a full arrest, not a detention. Not in every case, but in this case, there was no reason- That's not in every case. Why in this case? Why do you think this wasn't a Terry stop? I don't think it was because under this incident, in this case, there wasn't probable cause, and there was no reason to believe that Mr. Grice was armed or dangerous. I want to just- No, but you don't have to have probable cause for a Terry stop. It's reasonable suspicion. I don't think there was even reasonable suspicion that Mr. Grice had conducted, had done anything unlawful. The facts- Why not? Why not based on the call? Well, because the call, again, as relayed, was for a white male. When Mr., when Officer McVeigh- Don't leave out the red shirt. Give the full picture. He had a red shirt on. Your argument would be stronger if you can do that. He had a red shirt on, but there is case law that says one item of matching clothing is not enough. There, I would also just point out that when- The report that a person is at the tracks, on the tracks, not at the side, and when he gets there, there's the person, as described, except for the skin color, and wearing a red shirt. Is there any reason, really, for McVeigh to think that this was not the person who had been reported? The report was, at the time McVeigh arrived, that somebody had been kneeling by the tracks, not on the tracks. Right. But also, I do think there was a reason- Why does that matter? Because by the tracks could mean anything. By the tracks- It could be also kneeling over the tracks. There was kneeling on the tracks, I think, at one point. But drawing, that was much later in the incident that that was relayed. And again, it was one of three descriptions. But in any event, if the person is by the tracks, does the officer have to say, well, that doesn't mean he's on the tracks? It could be right next to the tracks, plus the fact that the person had something in his hand. Drawing all reasonable inferences in plaintiff's favor, he was never on the tracks. He was always lawfully standing by the roadside where anybody could stand. But the report didn't say that. The report said, bye. That could mean exactly where he was standing. We don't know because the caller could never be reached. The fact that it was because of a wrong number being relayed wasn't known to the officers at the time they tried to reach them. And so that caller remained unreliable. Do you think that the district court was wrong here? You'd quarrel with the district court's decision that there was reasonable suspicion. We do think that there wasn't reasonable suspicion to detain him at the moment that he was detained. And again, I just want to add some other facts for why it was unreasonable. When McVeigh initially arrives at the scene, he says, I see this man, he sees me. He takes a photograph. A train passes safely through the crossing. The gates go up and down. In Patterson, there was an issue with the interlocking system and the gates. No indication that that's what's happening here, because a train has safely gone through. There's nothing to indicate that something's been placed that's affecting those interlocking gates. When McVeigh arrives, and the train goes through, he says, after the train passes, and it takes a little while. He's surprised to see Mr. Grice is still standing there. Mr. Grice doesn't run, he doesn't do anything furtive, he doesn't act suspicious in any way. In fact, he completely and fully cooperates with Sergeant McVeigh. He answers all of his questions, he provides his name, his phone number. He says, you can look in my backpack. I have an email that says what I'm doing is permissible. He completely complies with everything that Sergeant McVeigh asked him to do. Very quickly- Did McVeigh look in the backpack? McVeigh looked in the backpack. They also looked at the phone. He did, yes. They also look at his phone, they check the photos. The photos don't show anything nefarious. They show what Mr. Grice said they would show, him taking photos of passing trains. And this cell phone, it's on, it's on the barricade, it records this entire incident. If they're so concerned that this is something that's going to trigger a bomb, they leave it there. They don't touch it. They don't have any concerns about it as indicated by the fact that it remains exactly there on the barricade. And then it's only at the end of the incident that it's picked up and put in the backpack. No one even looks at it then. It remains recording. You can hear the sounds of the car driving. No one's concerned about the cell phone. No one's concerned about the scanner. Maybe because he's handcuffed, I mean, that would be their argument. How's he going to detonate the phone if he's handcuffed? If this is an item that could detonate a bomb, I think we'd want to handle it very, very carefully. We wouldn't just pick it up and throw it in a backpack. I think that it's, there's also, I want to point out- I'm not making much of the fact that when he arrived though, Grice was on the roadside, not on the track side. Because obviously, somebody who had been on the tracks could have moved. And that's, you can't score the officer for that, because he wasn't still on the tracks. Your point is different. Your point is that these officers had no reason at all to arrest him and charge him for trespass, so that was contrived. Correct. That's a different, that comes in later. Well, I think it's right from the beginning, even on that- That's why they handcuffed him, right? That's why they arrested him. They arrest him because McVeigh claims he saw him trespassing, yes. And I think that's an- There's a square dispute of fact over that, correct? Correct, and I think that's why jurisdiction is really an issue here, and why this question of fact is not separable from all these other issues that we're discussing. McVeigh says he arrested him because he saw him trespassing on the tracks, right? Your client says, I wasn't on the tracks, I was to the side on a public right of way when I was arrested. And your argument is, therefore, no jurisdiction. There is no jurisdiction. When he was, quote, arrested, were Miranda warnings given? No. So, is it possible that it wasn't an arrest, at least in McVeigh's mind, it wasn't an arrest? Well, Miranda warnings would only come into play if they were going to be interrogating him, and arguably they- Is it possible that it wasn't an arrest, it was a cuffing in connection with a Terry stop detention? Drawing all inferences in plaintiff's favor, this was an arrest. Every hallmark of arrest was met. He was handcuffed. He was held for an hour in handcuffs. He was surrounded by officers. He was questioned and interrogated, though he wasn't given Miranda rights. I think the reasonableness of all of this is underscored all the more when you hear that portion of the tape, which is in the record. And you hear Mr. Grice start to cry and ask that his mother be called. I mean, does this indicate a terrorist? And yet at that point, he's still held. He's still held, he's still held, and then he's ultimately transferred to a precinct. He's still held, and he is charged with trespass on McVeigh's claim. And that is why- Which you claim is false. Which is false, and we believe is supported in the record that it's false, because you can hear the cell phone is sitting there. And when you listen to it, you can tell that Mr. Grice is standing by the cell phone, which is on the barricade the entire time. Thank you. Thank you. We'll hear rebuttal. The precise location where Grice was located when Anthony Vade arrived and before he arrived is not important. I took the MTA train down here today. Trains extend three to four feet beyond the boundaries of the tracks. Your adversary has pointed out that we're supposed to take the facts of the late most favorable to her client and also draw inferences. And that's because this is a motion for summary judgment. Yes. And the district court disagreed and said that these are jury questions. These are all jury questions, including qualified immunity. Because the facts are not straightforward here, and there are inferences to be drawn all over the place. So why wouldn't this naturally be a jury trial, jury case? The core facts are undisputed, Your Honor. We know he had a cell phone. We know he had a camera. That in and of itself is suspicious. Somebody taking photographs at a railroad crossing. A monitor where Grice listened to the communications of MTA personnel, that's suspicious too. The email in the backpack found by Sergeant McVay doesn't absolve him of having committed wrongdoing. Do you dispute that he was arrested on a public right of way where he had a right to be? I dispute that this could only be a de facto arrest. If you go through the, we have an advantage here. We have the cell phone recording, surreptitiously recorded by Grice. Not once, and we have a transcript that's in this joint appendix, about 50, 60, 70 pages. Not once does Grice mention the word trespass. He wasn't looking at this as a trespass case. He wanted to make sure the railroad crossing was safe. Was he charged with trespass when he was- Not by the Greenberg police. They released him. He wasn't charged until over an hour later when the MTA took him to headquarters, debriefed him, interviewed him. They wanted to know if he knew anything about the Patterson case, where the spikes and clips had been removed from the train tracks. And then they gave him a summons for trespass. Greenberg was gone, they're back at headquarters, they're on their next calls. They had nothing to do with it. This was based on McVeigh's information from McVeigh. McVeigh- Right? It was not based on information from McVeigh. How did they have any basis then for charging him for trespassing? Because they knew the initial- They didn't know if they hadn't talked to McVeigh. That makes zero sense. The MTA police, Your Honor, knew that a passing motorist had reported seeing Grice kneeling by the railroad tracks, which could constitute a trespass. McVeigh didn't report that to them. So it's your position that the call created probable cause to arrest this man for trespass? It did, and as mentioned in the briefs- It's just a testimony that McVeigh himself said he saw the client trespass, saw Grice- He saw him by the tracks, yes, he did say that. But the decision was made later on. The only place he saw him was on the right of way. Right, and there's no claim in this complaint, by the way, that Sergeant McVeigh was the proximate cause of the decision of the MTA to later arrest and charge Grice for trespass. And even if there weren't, and there's no malicious prosecution claim here, it's only one for false arrest. McVeigh had him in his custody for the 33, 45 minutes. You can argue about the precise period of time, but it's in that category. It's our argument that even though New York State's statutory criminal procedure law requires that a police officer witness a violation such as a trespass, for Fourth Amendment purposes, if there is otherwise probable cause to arrest, which there was for the MTA to arrest him for then it's not a false arrest claim at all. Thank you. Thank you both. We'll reserve decision. That's the last case on calendar. Please adjourn court. Court is adjourned.